WALSH PIZZI O'REILLY FALANGA LLP
Thomas J. O'Leary
Joseph L. Linares
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
(973) 757-1100 (Office)
(973) 757-1090 (Facsimile)
Attorneys for J.M. and E.M. individually and o/b/o E.M.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| J.M. and E.M., individually and o/b/o E.M.,<br><br>Plaintiffs,<br><br>vs.<br><br>SUMMIT CITY BOARD OF EDUCATION, DOREEN BABIS, individually, ANGELICA DASILVA, individually, and JANE DOES 1-10 (fictious individuals whose identities are presently unknown and who participated in depriving E.M. of her right to procedural due process and who retaliated against Plaintiffs),<br><br>Defendants | Civil Action No.<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, J.M. and E.M. (collectively referred to as the "Parents"), individually and on behalf of their minor daughter E.M., by way of Complaint against the Defendants say:

**NATURE OF THE ACTION**

1.      This action arises from the Defendant Summit City Board of Education's (the "District") refusal to allow E.M. to attend school in her local public school in violation of the Procedural Due Process Clause of the 14th Amendment to the United States Constitution and in violation of E.M.'s right to procedural due process as guaranteed to her by the New Jersey Constitution.

2.      This action also arises out of the District's violation of E.M.'s right to privacy and the Plaintiffs' right to autonomy and independence in parental decision making with respect to E.M. under the Fourteenth Amendment to the United States Constitution and Article 1 of the New Jersey Constitution.

3.      This action also arises from illegal, retaliatory actions that the Summit City Public schools and its employees took in response to the Plaintiffs' exercise of their right to privacy as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1 of the New Jersey Constitution. Specifically, the District retaliated against the Plaintiffs' by refusing to allow E.M. to attend school and by making a factually baseless complaint of neglect with the New Jersey Division of Child Protection and Permanency ("DCP&P").

4.      The action also raises from the District's failure to provide E.M. with equal access to educational programming as required by Section 504 of the Rehabilitation Act of 1973, *29 U.S.C. § 794* ("Section 504"), Title II of the Americans with Disabilities Act, *42 U.S.C. § 12131 et. seq.* ("ADA") and the New Jersey Law Against Discrimination, *N.J.S.A. § 10-5, et. seq.* ("NJLAD") and retaliatory actions taken by the District against the Parents in violation of Section 504, the ADA, and the NJLAD.

5.      Plaintiffs seek compensatory and punitive damages as a consequence of the District's illegal and retaliatory actions as well as an award of attorneys' fees and costs pursuant to *42 U.S.C. § 1988, 29 U.S.C. § 794a(b), 42 U.S.C. § 12205, N.J.S.A. § 10:5-27.1* and *N.J.S.A. § 10:6-2(f)*.

## THE PARTIES

6.      J.M. and E.M. (the "Parents") are the parents of E.M., who was born on October 17, 2011 and is currently a fifth grade student.  E.M. lives with her Parents within the boundaries of the District.

7.      The District has offices at 14 Beekman Terrace, Summit, New Jersey.

8.      Defendant Doreen Babis ("Babis") is the District's Director of Special Services.

9.      As the Director of Special Services, Babis is a part of upper management of the District because, among other things, she has broad supervisory power over the District's employees.

10.      Defendant Angelica DaSilva ("DaSilva") is a case manager at the District.

11.      Defendants Jane Does 1-10 are individuals whose identities are presently unknown to the Parents and who participated in depriving the Plaintiffs of their right to procedural due process under the Fourteenth Amendment to the United States Constitution and who retaliated against the Plaintiffs.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction pursuant to *28 U.S.C. § 1331* on the grounds that this action arises under the Fourteenth Amendment to the United States Constitution and the laws of the United States, including *29 U.S.C. § 794* and *42 U.S.C. §12131*.

13.      Pursuant to *28 U.S.C. § 1367*, this Court has supplemental jurisdiction over the Plaintiffs' claims brought under New Jersey State Law including the New Jersey Constitution and the NJLAD as they are related to the federal claims in this action that are within the Court's original jurisdiction such that they form part of the same case or controversy.

14.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that venue is provided by law, all parties reside within this judicial district and the events giving rise to the federal claims set forth herein occurred within this judicial district.

## FACTS COMMON TO ALL COUNTS

15.  In September 2018, E.M. enrolled as a student in the District and began attending first grade at Washington Elementary School.

16.  In January 2019, the Parents had Carolyn McGuffog, Ph.D., Ed.D perform a neuropsychological evaluation of E.M.  In connection with this evaluation, McGuffog administered nineteen (19) tests to assess E.M.

17.  On March 26, 2019, the Parents forwarded the report of McGuffog's neuropsychological evaluation (the "Neuropsychological Evaluation Report") of E.M.

18.  In the Neuropsychological Evaluation Report, McGuffog diagnosed E.M. with, among other things, "Autism Spectrum Disorder – Social Communication – Level 1 and Restricted Repetitive Behaviors – Level 1," "Attention Deficit Hyperactivity Disorder – Combined Presentation," and "Generalized Anxiety Disorder."

19.  In the Neuropsychological Evaluation Report, McGuffog reported that "[i]t appears [E.M.] has memorized social rules and mores" and that she engages in "odd language use." McGuffog further reported that E.M.'s "sentences are sophisticated but 'canned," as if memorized rather than spontaneously constructed."

20.  In the Neuropsychological Evaluation Report, McGuffog reported that E.M. "seems to memorize social conventions, as her social problem-solving skills as assessed by a test of social problem solving fell in the below average range (27th percentile)."

21.    In the Neuropsychological Evaluation Report, McGuffog reported that "[p]ragmatic language emerged as an area of notable weakness for [E.M.], indicating difficulty interpreting nuances embedded in social language."

22.    In the Neuropsychological Evaluation Report, McGuffog also reported that E.M. scored in the 98th percentile on the Digits Forward portion of the Digit Span subtest of the Wechsler Intelligence Scale For Children -Fifth Edition (the "WISC-V) and that E.M. "showed Extremely High rote auditory memory … recalling up to seven-digit sequences."  In contrast, McGuffog reported that E.M earned a significantly lower score on the Digits Backward portion of the Digit Span subtest of the WISC-V and that E.M. scored "in the Low Average range (16th percentile), when she was asked to reverse digit sequences."

23.    On June 17, 2019, the District identified E.M. as a student who is eligible for special education and related services under the Individuals With Disabilities Education Action, *20 U.S.C. § 1400 et. seq.*

24.    In September 2019, E.M. started second grade at the Washington School.

25.    When E.M. started second grade, the District had a policy for Student Suicide Prevention (hereinafter "District Policy 5350").

26.    District Policy 5350 directed school district staff members are "to be alert to a student who exhibits warning signs of self-destruction or who threatens or attempts suicide. Any such warning signs or the report of such warning signs from another student or staff member shall be taken with the utmost seriousness and reported immediately to the Principal or designee."

27.    District Policy 5350 directed that "[t]he Principal or designee shall immediately contact the parent(s) of the student exhibiting warning signs of suicide to inform the parent(s) the

student will be referred to the Child Study team or a Suicide Intervention Team, appointed by the Superintendent or designee, for a preliminary assessment."

28.    District Policy 5350 directed that "[u]pon completion of the preliminary assessment, the Principal or designee shall meet with the parent(s) to review the assessment."

29.    District Policy 5350 directed that "[b]ased on the preliminary assessment, the parent(s) may be required to obtain medical or psychiatric services for the student. In the event the parent objects to the recommendation or indicates an unwillingness to cooperate in the bests interests of the student, the Principal or designee will contact the New Jersey Department of Children and Families, Division of Child Protection and Permanency to request intervention on the student's behalf."

30.    District Policy 5350 directed that "[i]n the event the student is required to obtain medical or psychiatric services, the parent(s) will be required to submit to the Superintendent a written medical clearance from a licensed medical professional, selected by the parent(s) and approved by the Superintendent, indicating the student has received medical services, does not present a risk to themselves or others, and is cleared to return to school. The parent(s) shall be required to authorize their healthcare professional(s) to release medical information to the school district's healthcare professional, if requested."

31.    On Friday September 20, 2019 at approximately 10:00 a.m., E.M. was removed from her classroom to sit in a hallway with multiple distractions next to caterpillars, that she had been fixated on for over a week, for a "special" math lesson for students struggling in with math. Jill Plofsky ("Plofsky"), a special education teacher at the Washington School, conducted the math lesson.

32.     After the math lesson, E.M. returned to her classroom and sat on a bean bag chair until lunch. At lunch, she ate in the cafeteria with her friends.

33.     At approximately 11:00 a.m, Plofsky reported to Lauren Banker ("Banker"), the principal of the Washington Elementary School, that E.M. had commented "I want to die" when she was working with a small group of students and that she had experienced difficulties in the math class that took place in the hallway.

34.     After E.M. stated "I want to die," Plosky offered positive reinforcement and encouragement to her.  Plofsky overheard E.M. complain and mumble under her breath "I wanna die." A short time later, E.M. repeated "I wanna die" out loud in front of other students.

35.     At least two hours after E.M. had stated "I wanna die" to other students and after she had eaten lunch in the cafeteria with her classmates, E.M. met with Angelica DaSilva ("DaSilva"), a school psychologist, and Nicole Allen ("Allen"), a special education services supervisor at the District.

36.     In contravention of Board Policy 5350, no one from the District informed the Parents that DaSilva and Allen would be performing a suicide risk assessment on E.M.

37.     At 1:05 p.m., DaSilva telephoned J.M. and left him a voicemail message saying everything was fine but that E.M. "had made some statements at home that needed to be discussed." There was no mention of an emergency in the message that DaSilva left J.M.  DaSilva did not advise J.M. in the voicemail message that the District intended to perform a suicide risk assessment on E.M.

38.     Despite this, DaSilva and Allen proceeded to conduct a suicide risk assessment of E.M.

39.    After assessing E.M., DaSilva and/or Allen completed a "Suicide Risk Assessment" form.

40.    The Suicide Risk Assessment" form that DaSilva and/or Allen completed stated that the "Student is referred for further screening."

41.    The Suicide Risk Assessment" form that DaSilva and/or Allen completed did not state that the Parents were required to obtain medical or psychiatric services for E.M.

42.    The "Suicide Risk Assessment" form which DaSilva and/or Allen completed also stated in pertinent part:

RE-ENTRY/SAFETY PLAN:

- A safety plan needs to be completed the day of the assessment, if he student is sent back to class. See attached.

- If the student is sent out for further assessment, a safety plan should be completed the day [sic] the return to school.

43.    The "Suicide Risk Assessment" form which DaSilva and/or Allen completed did not state that the Parents were required to obtain medical or psychiatric services for E.M. before she could return to school.

44.    At the time E.M. stated "I want to die," she was working on counting backwards. Because the District had received the Neuropsychological Evaluation Report in March 2019, DaSilva knew, or should have known, that McGuffog reported that E.M. had scored on the 16th percentile on the Digits Backward portion of the Digit Span subtest of the WISC-V and that E.M.'s "working memory for novel input is significantly weaker than rote recall." Further, DaSilva knew from a psychological evaluation that she had performed on E.M in May 2019 that she had received a standard score of 78 (7th percentile) on "Numbers Reversed" when DaSilva administered the Woodcock-Johnson IV, Tests of Cognitive Abilities.

45.     At the time E.M. stated "I want to die," she was receiving a math lesson in a hallway and sitting next to caterpillars that she had fixated on for over a week.  Because the District had received the Neuropsychological Evaluation Report in March 2019, DaSilva knew, or should have known, that McGuffog reported that E.M. has "trouble working in a noisy environment" and "sustaining attention."

46.     When DaSilva and Allen performed the suicide risk assessment on E.M., they knew she had autism.

47.     Because the District had received the Neuropsychological Evaluation Report in March 2019, DaSilva knew, or should have known, that McGuffog had reported that E.M. "frequently circumlocuted, giving too much information, and she showed difficulty with saliency determination. Her language was tangential, disorganized and sentence structure was poor. As such, it was often difficult to follow what she was talking about."

48.     Because the District had received the Neuropsychological Evaluation Report in March 2019, DaSilva knew, or should have known, that McGuffog had reported that "projective assessment reveals problems with sentence construction, sequencing, organization and perspective taking. Thus, despite talking a lot, [E.M.] has trouble expressing herself cogently" and that "[p]ragmatic language emerged as an area of notable weakness for [E.M.], indicating difficulty interpreting nuances embedded in social language."

49.     Because the District had received the Neuropsychological Evaluation Report in March 2019, DaSilva knew, or should have known, that McGuffog had reported that E.M.'s "odd language usage" was "suggestive of 'canned' expressions" and that "[i]t appears that [E.M.] memorizes rather than creates sentences" and that "[s]he additionally seems to memorize social conventions…."

50.     When DaSilva and Allen interviewed E.M., she made statements that were contradictory and indicative of her disabilities.

51.     For instance, DaSilva and Allen reported that E.M. "was asked if she has thought about ways she would die or know she would kill herself" whereupon E.M. stated 'I would take a steak knife and cut my head off.'" When DaSilva and Allen asked E.M "if she has ever touched or picked up a knife to hurt herself," they reported that E.M. said "no" and "expressed feeling 'too scared because mom will ground me for life.'"

52.     DaSilva and Allen also reported that when E.M. "was asked if there was ever any other way she has thought of hurting herself," E.M. "said she would 'dye of boredom or starve to death.'" When they questioned E.M. about withholding food, DaSilva and Allen reported that E.M. stated that "she had half a donut for breakfast and ate lunch at school."

53.     Notwithstanding the District's receipt of the Neuropsychological Evaluation Report in March 2019 and the patently obvious inconsistencies in the statements made by E.M. that were indicative of Autism Spectrum Disorder, DaSilva telephoned J.M. at 1:17 p.m. and advised him that there was an emergency.

54.     At 1:23 p.m., E.M.'s mother telephoned the Washington School to find out what was wrong and was informed of the comments that E.M. had made and that someone needed to pick her up from school immediately.  When E.M.'s mother asked if she could speak with Plofsky, E.M's mother was informed that Plofsky was not available.

55.     At 2:05 p.m., E.M.'s mother arrived at Washington School. DaSilva and Allen reviewed the results of the Suicide Risk Assessment with her.  DaSilva and Allen presented E.M.'s mother with a "Parent/Guardian Emergency Conference Notice" form, which among other things,

stated "I have been advised that I should immediately take my child to a hospital or outside private professional to be evaluated."

56.     The Suicide Risk Assessment that the District conducted did not state that E.M. was a risk to other students. When E.M.'s mother met with DaSilva and Allen, they did not advise her that E.M. was a risk to other students.

57.     When E.M.'s mother met with DaSilva and Allen, they did not advise her to provide the clinician who would be conducting a further assessment of E.M. with a hard copy of the District's Suicide Risk Assessment.  Further, there was no indication in any of the paperwork that DaSilva and Allen provided to E.M.'s mother that the District's Suicide Risk Assessment should be provided to the clinician who would be conducting a further assessment of E.M.

58.     While at the Washington School, E.M.'s mother asked to speak with Plofsky. Banker advised E.M.'s mother that Plofsky was not available and that she would have to schedule an appointment to meet with her.

59.     The Parents immediately took E.M. to Overlook Hospital and waited six hours in the Emergency Room in order to have her screened as recommended by the District.

60.     At Overlook Hospital, Constance Booth ("Booth"), a licensed clinical social worker, assessed E.M. and consulted with a psychiatrist.

61.     While the Parents did not provide Booth with a hard copy of the Suicide Risk Assessment that had been conducted by the District, they informed Booth of the substance of what DaSilva and Allen had advised E.M.'s mother.

62.     The evaluating clinician at Overlook Hospital assessed E.M. and determined that she did not require hospitalization.

63.    Overlook Hospital provided the Parents with a "Report to Schools of Assessment for Psychiatric Hospitalization" on a standard preprinted form, which stated in pertinent part:

"Did the referring school provide collateral information? No.

At the time of the evaluation, the recommendation for the referred student is: Hospitalization is not recommended.

Clinical recommendations are listed on Follow-Up Referral form and given to parents/guardians."

64.    On Monday September 23, 2019, at 12:36 a.m., E.M.'s mother forwarded an email to the Board of Education and requested that the standard pre-printed "Report to Schools of Assessment for Psychiatric Hospitalization" form that had been issued by Overlook Hospital be forwarded to the District's Superintendent of Schools. In her email, E.M.'s mother provided a timeline of the Parents' understanding of what had occurred the previous Friday and advised:

I'm not sure what happened between 1:04 pm and 1:16 pm that the issue became an emergency but it is difficult to conceive that this was such an alarming issue given that [E.M.] was allowed to finish out the morning in her classroom and eat lunch with her friends.

Also disturbing is the school's not having the teacher who was present for the incident available to speak with the parents despite the parent's willingness to wait for the end of the day when the teacher would not be teaching.

Perhaps one of the more perplexing parts of this incident is that my ADHD easily distracted child was put in a hallway with multiple distractions next to caterpillars that she has been fixated by for over a week to learn math with a group of struggling math students despite our having been told "school based evaluations did not reveal mathematics as an area of weakness." We appear to be the only parents not previously notified that our child would be participating in this group. After speaking with [E.M.], the main source of her frustration were the distractions in the hallway and the proximity of the caterpillars. She was having a difficult time concentrating and this led to her frustration and the comment in question.

Please let me know when my 7 year old will be allowed to return to school.

65.    By email dated September 23, 2019, Babis informed the Parents that "[w]e are in receipt of the psychiatric clearance for [E.M.]."  Babis informed the Parents that the psychiatric clearance that Overlook Hospital had issued was not acceptable because "the information provided by the school was not shared with [Overlook Hospital] as evidenced by the response of 'No' to the question, 'Did the referring school provide collateral information?" Babis requested authorization for the District to speak with the evaluating clinician or that the Parents "provide written documentation confirming that the paperwork shared by the district was reviewed and considered by the evaluator." Babis further advised that "[a]s soon as you have obtained this documentation, please reach out to Mrs. DaSilva so that a reentry meeting can be scheduled."

66.    By email dated September 24, 2019, Babis "requested signed consent for us to speak with the evaluating clinician or written documentation confirming that the paperwork shared by the district was reviewed and considered by the evaluator." Babis further advised "[a]s soon either one of these is provided, please reach out to Mrs. DaSilva so that a reentry meeting can be scheduled."

67.    By email dated September 25, 2019, Babis reiterated the District's request for written documentation from Overlook Hospital confirming that the District's suicide risk assessment had been reviewed by the evaluating clinician or, alternatively, authorization for the District to speak with the clinician that had assessed E.M.  In her email, Babis "noted that the clearance form attached to your email [to the Board of Education] indicted that 'no' school information was shared with the clinician."

68.    In light of Babis' requests, the Parents contacted Overlook Hospital and inquired if Overlook Hospital would amend its psychiatric clearance form if they provided a copy of the

District's suicide risk assessment to the clinician who had assessed E.M.  Overlook Hospital advised the Parents that the psychiatric clearance form would not be amended.

69.     By letter dated September 26, 2019, the Parents advised Babis that E.M. "told us that she was very frustrated with the distractions in the hallway and was having trouble concentrating which led her to making a comment that she wanted to die. [E.M.] did not threaten the safety of any other students."  The Parents further advised Babis that since the time they had emailed the psychiatric clearance form from Overlook Hospital "you have sent three emails advising that the school will not accept the clearance letter and that [E.M.] is not allowed to return to school until we either allow the school to speak with the mental health professional or we submit the school's paperwork to the hospital.  Per District Policy 5350, none of this is required for [E.M.] to return to school."  The Parents also advised Babis "prior to taking [E.M.] to Overlook Medical Center, we were not asked by the District to share the documentation with the evaluating clinician, but we did share the substance of the concerns expressed in that paperwork with the evaluating clinician" and that "[w]e are not going to grant authorization to the District to speak with the evaluating clinician."

70.     By email dated September 27, 2019, Babis, in a mistaken reliance upon Board Policy 5350, arbitrarily imposed a new requirement upon the Parents before the District would allow E.M. to return to school - that they provide documentation that "[E.M.] has received medical services."

71.     By email dated October 2, 2019, E.M.'s mother advised Babis that "[y]ou're not entitled to [E.M.'s] private medical information and we are not going to consent to the District having access to that information." She further advised Babis "I have consulted with Overlook Medical Center and have been advised that they will not amend the clearance letter.  It's my

understanding that this is their standard letter that they routinely send to school districts." E.M.'s mother concluded her email to Babis by stating "[w]e believe that the District's position is unwarranted given that we obtained a clearance letter from Overlook and there is no indication in any of the documentation provided by the District that [E.M.] poses a threat to the safety of other students."

72.     By email dated October 3, 2019, Babis, in a mistaken reliance on Board Policy 5350, advised the Parents that "it is imperative that you provide one of the following:

> Authorization for our board physician to speak with the evaluating clinician at Overlook; or alternatively,
>
> The recommendations shared by Overlook for follow up treatment; and documentation from a clinician that the recommendations are being followed."

Babis further advised the Parents that E.M.'s "safety and return to school are of the utmost importance to us, and evidence that the risk of self-harm is being addressed is necessary…." Babis also advised the Parents "[i]n the event that you elect to not provide the above information, considering the school days that [E.M.] has missed, and reserving all rights, we will provide home instruction for [E.M.] Please contact Alice Englese in the Office of Special Services, if you would like to set up that instruction."

73.     By email dated October 8, 2019, Babis, in a mistaken reliance on Board Policy 5350, advised the Parents that "it is imperative that you provide one of the following:

> 1. Authorization for our board physician to speak with the evaluating clinician at Overlook;
>
> 2. The recommendations shared by Overlook for follow up treatment; and documentation from a clinician that the recommendations are being followed.
>
> 3. Authorization for our board physician to speak with [E.M.'s] current physician or therapist regarding our concerns for follow up care."

15

In her email, Babis also requested that the Parents contact Alice Englese ("Englese") to set up home instruction and threatened to report the Parents to DCP&P in the event that the Parents did not accede to her demand that the District be provided with medical information about E.M.

74.    By letter dated October 9, 2019, the Parents advised Babis that E.M. "is fine and is not (and never was) suicidal" and that they had spent six hours in the emergency room at Overlook Hospital and obtained a standard clearance letter, which stated that E.M. did not require hospitalization. The Parents further advised Babis "[d]espite this, the District has refused to accept this letter and had refused our repeated requests that [E.M.] be allowed to return to school. As we advised in our September 26th letter and October 3rd email, the District is not entitled to [E.M.'s] private medical information, and we are not going to consent to the District or its physician having access to that information." The Parents further advised that, in light of the District's refusal to allow E.M. to return to school, "we are removing her from the Summit Public Schools and plan to place her in a private school" and that they intended to seek retroactive reimbursement from the District for tuition costs and the costs of any therapies that they provided E.M." The Parents concluded their letter by requesting that Englese contact them to set up home instruction until they could locate a private school placement for E.M.

75.    By email dated October 16, 2019, Babis reiterated her inappropriate requests for

1.    "Authorization for our board physician to speak with the evaluating clinician at Overlook;

2.    The recommendations shared by Overlook for follow up treatment; and documentation from a clinician that the recommendations are being followed.

3.    Authorization for our board physician to speak with [E.M.'s] current physician or therapist regarding our concerns for follow up care."

In her email, Babis advised the Parents that "[p]ursuant to Board Policy 5350, subsequent to a risk assessment, parents 'may be required to obtain medical or psychiatric services for [a] student,'" and that "[w]e are not able to determine whether [E.M.] requires such services until the foregoing authorizations and documentation are provided." Babis further advised the Parents that the District was withdrawing its offer of home instruction and that the District would file a truancy complaint in municipal court and report the Parents to DCP&P if they did not promptly advise the District where they intended to enroll E.M.

76. By email dated October 18, 2019, E.M.'s mother advised Babis that "[f]or nearly a month, the District has refused to allow [E.M.] to return to school because [the Parents] have refused to accede to your demand for [E.M.'s] private medical information." E.M.'s mother further advised Babis "[a]s you know full well, [the Parents] immediately took [E.M.] to the emergency room at Overlook Medical Center and, after waiting for 6 hours, had her assessed as had been requested by the District. We provided the District with a standard letter from Overlook which stated that she did not require hospitalization. We have also advised you previously that [E.M.] is fine and is not (and never was) suicidal. Despite this the District has refused our repeated requests to allow [E.M.] to return to school."

77. In her October 18, 2019 email, E.M.'s mother further advised Babis that her "strong arm tactics are disturbing. If the District had been truly 'deeply concerned' about the possibility that [E.M.] harm herself, it would have reported us to DCP&P weeks ago. As of October 3rd, you were quite content to have [E.M.] remain at home until we succumbed to your demand that we provide the District with access to [E.M.'s] private medical information. There was no indication in your October 3rd email that the offer of home instruction 'was intended as a temporary measure' and you did not express any intention to report [the Parents] to DCP&P."

17

E.M.'s mother further advised Babis that after the Parents had received her threatening email on October 8th, 2019, they felt that they had no choice but to remove [E.M.] and request that the District provide home instruction for her until they could locate a private school placement.

78.     By email dated October 28, 2019, Babis baselessly advised the Parents that "[i]t is unfortunate that you continue to deny [E.M.'s] access to her educational program."  Babis also baselessly accused the Parents of deliberately withholding the District's Suicide Risk Assessment from the evaluating clinician at Overlook Hospital. In her email, Babis advised the Parents that pursuant to Board Policy 5200(E)(2), "[r]eadmission to school requires '[a] note explaining a student's absence for a noncommunicable illness for a period of more than five school days must be accompanied by a physician's statement of the student's illness with medical clearance to return to school" and that they "must now provide medical clearance pursuant to Board Policy 5200(E)(2)."

79.     By email dated October 30, 2019, E.M.'s mother advised Babis that "[t]here is no basis for your assertion that I 'withheld information from the medical provider.'" Again, E.M.'s mother reminded Babis that the District's "paperwork contained no statement that we should share the completed rating scale or Ms. DaSilva's narrative with the evaluating clinician," that "no one from the District advised us to share this documentation with the evaluating clinician," and that we orally shared the substance of the concerns that were expressed to use by the District with the evaluating clinician."

80.     In her email of October 30, 2019, E.M.'s mother also advised Babis that her assertion that the Parents "continue to deny [E.M.'s] access to her educational program is equally baseless." E.M.'s mother reminded Babis that "[f]or more than a month, the District refused to allow [E.M.] to return to school despite our requests that she be allowed to do so. On September

18

20th, we obtained a letter from Overlook which stated that she did not require hospitalization. Quite obviously, [E.M.] did not present a risk of immediate self-harm to the evaluating clinician. Further, [we] advised you on October 9th that '[E.M.] is fine and is not (and never was) suicidal.'"

81.     E.M.'s mother further advised Babis that the Parents disagreed "with your assertion that the 'appropriate medical clearance' that the District seeks does not constitute private medical information. In your September 27th email you advised use that we had to, among other things, provide 'documentation' indicating that '[E.M.] has received medical services' and 'is cleared to return to school.'" E.M.'s mother also reminded Babis that "[o]n October 3rd, you requested 'Authorization for our Board physician to speak with the evaluating clinician at Overlook' or '[t]he recommendations shared by Overlook for follow up treatment, and from a clinician that the recommendations are being followed.'" E.M.'s mother further advised Babis that "[y]our emails from October 8th and October 16th contain identical requests or, as an alternative, 'Authorization for our Board physician to speak with [E.M.'s] current physician or therapist regarding our concerns for follow up care.'" E.M.'s mother informed Babis that "[t]hese requests seek [E.M.'s] private medical information, and the District is not entitled to that information."

82.     E.M.'s mother concluded her October 30, 2019 email to Babis by advising "[b]ecause you insisted that [E.M.] could not return to school unless we acceded to your demands, we had no choice but to enroll [E.M.] at the Winston School in Short Hills, where she is now a full time student."

83.     By email dated October 31, 2019, Babis advised the Parents "[p]lease know that you may return [E.M.] to our schools at any time upon presentation of the required and appropriate medical information, which we previously discussed at length.  We wish [E.M.] success in her new school."

19

84.     There was no basis under Board Policy 5350 for Babis' continued insistence that the District be granted access to E.M.'s private medical information.  Board Policy 5350 stated that "[b]ased on the preliminary assessment, the parent(s) may be required to obtain medical or psychiatric services for the student." The "Suicide Risk Assessment" form which DaSilva and/or Allen completed did not state that the Parents were required to obtain medical or psychiatric services for E.M. before she could return to school. It only stated that "Student is referred for further screening."

85.     The District had no right to insist that it be allowed to speak with the evaluating clinician at Overlook Hospital or to otherwise have access to E.M.'s private medical information. In doing so, the District inappropriately sought to intrude upon E.M.'s right to privacy in contravention of the Fourteenth Amendment to the United States Constitution.

86.     The District had no right to insist that it be allowed to speak with the evaluating clinician at Overlook Hospital or to otherwise have access to E.M.'s private medical information. In doing so, the District inappropriately sought to intrude upon the Parents' right to autonomy and independence in their parental decision making regarding E.M. in contravention of the Fourteenth Amendment to the United States Constitution.

87.     The District had no right to insist that it be allowed to speak with the evaluating clinician at Overlook Hospital because confidential communications between a licensed clinical social worker during the course of diagnosis and treatment are privileged under Federal and New Jersey law.

88.     Since September 23, 2019, the District has refused to allow E.M. access to a public education at her local public school.

20

**COUNT I**
**Violation of the Procedural Due Process Clause of the**
**14ᵗʰ Amendment to the United States Constitution - 42 U.S.C. § 1983**
**(The District)**

89.     The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

90.     The Due Process Clause of the Fourteenth Amendment prohibits the District and others acting under the color of State Law from depriving "any person of life, liberty, or property without due process of law." *U.S. CONST. amend. XIV, § 1.*

91.     New Jersey has a compulsory education law which provides that "[e]very parent, guardian or other person having custody and control of a child between the ages of six and 16 years of age shall cause such child to attend the public schools of the district or a day school in which there is given instruction equivalent to that provided in public schools for children of similar grades and attainments or to receive equivalent instruction elsewhere than at school." *N.J.S.A.* §18A:38-25.

92.     Accordingly, E.M. has a property interest in a public education.

93.     As set forth at length in paragraphs 31 through 88 herein, the District has refused to allow E.M. to attend school since September 23, 2019.

94.     Throughout the entire time that E.M. has been precluded from attending school, the District failed to afford the Parents a hearing.

95.     Throughout the entire time that E.M. has been precluded from attending school, the District failed to provide the Parents with an opportunity to cross-examine Plofsky, Banker, DaSilva, Allen, and Babis.

21

96.    By its policies, practices, actions, or omissions, the District, its employees and agents, acting under color of state law, violated E.M.'s right to procedural due process as guaranteed by the Fourteenth Amendment of the United States Constitution, as enforceable through *42 U.S.C. § 1983.*

97.    District Policy 5350 was the "moving force" behind the violation of E.M.'s right to procedural due process.

98.    District Policy 5350 directs that "[i]n the event the student is required to obtain medical or psychiatric services, the parent(s) will be required to submit to the Superintendent a written medical clearance from a licensed medical professional, selected by the parents) and approved by the Superintendent, indicating the student has received medical services, does not present a risk to themselves or others, and is cleared to return to school."

99.    District Policy 5350 does not provide for a hearing and an opportunity to cross-examine witnesses consistent with the procedural due process clause of the Fourteenth Amendment to the United States Constitution.

100.    Between October 8, 2019 and October 11, 2019, upon information and belief, DaSilva, at the direction of Babis, filed a factually baseless complaint with DCP&P that E.M. was a victim of neglect.

101.    On October 25, 2019, DaSilva followed up with DCP&P and was informed that DCP&P had "determined that there is no neglect and abuse" and that "it was the school's decision to not let [E.M.] back into school." DCP&P further advised DaSilva "that the family has rights and that there is nothing to be done as far as DCP&P services."

102.    When Babis sent her emails on October 28, 2019 and October 30, 2019 insisting that the District be granted access to E.M.'s private medical information and threatening to deny

22

E.M. of her right to a public education unless the Parents acceded to her inappropriate demands, the District knew that DCP&P had found that there was no neglect.

103.    The aforesaid actions of the District, and Babis in particular, in refusing, and continuing to refuse, to allow E.M. access to a public education evidence an intentional, willful, wanton and reckless disregard of E.M.'s right to procedural due process under the Fourteenth Amendment to the United States Constitution.

104.    The aforesaid actions of the District, its employees, and agents were intentional and, at a minimum, were deliberately indifferent to the likelihood that E.M would be deprived of her property interest in a public education without procedural due process based on the past occurrences of these same constitutional and statutory violations of the law.

105.    As a direct proximate and foreseeable result of the District's violation of E.M.'s right to procedural due process under the Fourteenth Amendment to the United States Constitution, the Parents have been, and continue to be, damaged.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendant Summit City Board of Education:

a.    Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.    Awarding compensatory damages;

c.    Awarding punitive damages;

d.    Awarding reasonable attorney's fees and costs pursuant to *42 U.S.C. § 1988;* and

e.    Awarding such further relief as the Court deems just and proper.

23

**COUNT II**
**Violation of the Procedural Due Process Clause of the**
**14th Amendment to the United States Constitution - 42 U.S.C. § 1983**
**(Babis and Jane Does 1-10)**

106. The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

107. E.M. has a property interest in a public education as aforesaid.

108. As set forth at length in paragraphs 31 through 88 herein, Babis, and Jane Does 1-10 have refused to allow E.M. to attend school since September 23, 2019.

109. Babis and Jane Does 1-10 had no authority under District Policy 5350 to insist that the District's physician to speak with the clinician at Overlook Hospital who evaluated E.M.

110. Babis and Jane Does 1-10 had no authority under District Policy 5350 to insist that the Parents provide the District with the Overlook Hospital's recommendations for follow-up treatment and documentation from a clinician that the recommendations were being followed.

111. Babis and Jane Does 1-10 had no authority under District Policy 5350 to insist that the Parents provide authorization for the District's physician to speak with E.M.'s physician or therapist regarding the District's concerns for follow up care.

112. Further, Babis and Jane Does 1-10 had no authority under District Policy 5350 to preclude E.M. from attending school.

113. While in some circumstances Board Policy 5350 may require medical clearance to be submitted before a student is permitted to return to school, Board Policy 5350 is clear that a requirement to furnish medical clearance is only necessary if "the student is required to obtain medical or psychiatric services" and that the District's determination of whether a student will be

24

required to obtain medical or psychiatric services is supposed to be "[b]ased on the preliminary assessment" and not on the arbitrary whim of Babis and Jane Does 1-10.

114.    Towards this end, Board Policy 5350 stated that "[b]ased on the preliminary assessment, the parent(s) may be required to obtain medical or psychiatric services for the student."

115.    The "Suicide Risk Assessment" form which DaSilva and Allen completed did not state that the Parents were required to obtain medical or psychiatric services for E.M. before she could return to school.

116.    The "Suicide Risk Assessment" form which DaSilva and Allen had completed only stated that "Student is referred for further screening."

117.    The Parents had E.M. screened as requested by the District, and Overlook Hospital determined that she did not require hospitalization.

118.    Throughout the entire time that E.M. has been precluded from attending school, Babis and Jane Does 1-10 failed to afford the Parents a hearing.

119.    Throughout the entire time that E.M. has been precluded from attending school, Babis and Jane Does 1-10 failed to provide the Parents with an opportunity to cross-examine Plofsky, Banker, DaSilva, and Allen.

120.    Babis and Jane Does 1-10, acting under color of state law, violated E.M.'s right to procedural due process as guaranteed by the Fourteenth Amendment of the United States Constitution, as enforceable through *42 U.S.C. § 1983.*

121.    When Babis sent her emails on October 28, 2019 and October 30, 2019 insisting that the District be granted access to E.M.'s private medical information and threatening to deny E.M. of her right to a public education unless the Parents acceded to her demands, the District knew that DCP&P had found that there was no neglect as aforesaid.

122.   The aforesaid actions of Babis and Jane Does 1-10 in refusing, and continuing to refuse, to allow E.M. access to a public education evidence an intentional, willful, wanton and reckless disregard of E.M.'s right to procedural due process under the Fourteenth Amendment to the United States Constitution as aforesaid.

123.   The aforesaid actions of Babis and Jane Does 1-10 were intentional and, at a minimum, were deliberately indifferent to the likelihood that E.M would be deprived of her property interest in a public education without procedural due process based on the past occurrences of these same constitutional and statutory violations of the law.

124.   As a direct proximate and foreseeable result of Babis' and Jane Does 1-10's violation of E.M.'s right to procedural due process under the Fourteenth Amendment to the United States Constitution, the Parents have been, and continue to be, damaged.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendants Doreen Babis and Jane Does 1-10:

a.   Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.   Awarding compensatory damages;

c.   Awarding punitive damages;

d.   Awarding reasonable attorney's fees and costs pursuant to *42 U.S.C. § 1988;* and

e.   Awarding such further relief as the Court deems just and proper.

**COUNT III**
**Violation of Section 504**
**(The District)**

125.    The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

126.    The District receives federal funds and is, therefore, subject to Section 504.

127.    E.M. has impairments that substantially limit and affect her major life activities and is, therefore, as disabled person within the meaning of Section 504.

128.    As set forth with particularity in paragraphs 45 through 53 herein, the District knew that E.M. has autism spectrum disorder and, should have known, that E.M. actions and statements were indicative of her disabilities when DaSilva and Allen performed a suicide risk assessment on E.M.

129.    After the District performed a suicide risk assessment on E.M., the District refused, and has continued to refuse, to allow E.M. access to a public education in violation of Section 504.

130.    The District has violated E.M.'s right to be free from discrimination on the basis of her disabilities by denying her access to the District's programs and activities since September 23, 2019.

131.    When Babis sent her emails on October 28, 2019 and October 30, 2019 insisting that the District be granted access to E.M.'s private medical information and threatening to deny E.M. of her right to a public education unless the Parents acceded to her demands, the District knew that DCP&P had found that there was no neglect as aforesaid.

132.    The aforesaid actions of the District, and Babis in particular, in refusing, and continuing to refuse, to allow E.M. access to a public education evidence an intentional, willful,

27

wanton and reckless disregard of E.M.'s right to be free from discrimination on the basis of her disabilities in violation of Section 504.

133.    The aforesaid actions of the District, its employees, and agents, were intentional and, at a minimum, were deliberately indifferent to the likelihood of a violation of E.M.'s right to be free from discrimination on the basis of her disabilities under Section 504 based on the past occurrences of these same constitutional and statutory violations of the law.

134.    As a direct, proximate, and foreseeable result of the aforesaid violation of Section 504, the Parents have been, and continue to be, damaged.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendant Summit City Board of Education:

a.    Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.    Awarding compensatory damages;

c.    Awarding reasonable attorney's fees and costs pursuant to *29 U.S.C. § 794a(b);* and

d..    Awarding such further relief as the Court deems just and proper.

## COUNT IV
### Violation of Title II of the ADA
### <u>(The District)</u>

135.    The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

136.    The District is a public entity subject to Title II of the ADA.

28

137.    E.M. has impairments that substantially limit and affect her major life activities and is, therefore, a disabled person within the meaning of the ADA.

138.    Title II of the ADA provides in pertinent part: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity.

139.    As set forth with particularity in paragraphs 45 through 53 herein, the District knew that E.M. has autism spectrum disorder and, should have known, that E.M.'s actions and statements were indicative of her disabilities when Da Silva and Allen performed a suicide risk assessment on E.M. as aforesaid.

140.    After the District performed a suicide risk assessment on E.M., the District refused, and continues to refuse, to allow E.M. access to a public education in violation of the ADA.

141.    The District has violated E.M.'s right to be free from discrimination on the basis of her disabilities by denying her access to the District's programs and activities since September 23, 2019 as aforesaid.

142.    When Babis sent her emails on October 28, 2019 and October 30, 2019 insisting that the District be granted access to E.M.'s private medical information and threatening to deny E.M. of her right to a public education unless the Parents acceded to her demands, the District knew that DCP&P had found that there was no neglect as aforesaid.

143.    The aforesaid actions of the District, and Babis in particular, in refusing, and continuing to refuse, to allow E.M. access to a public education evidence an intentional, willful, wanton and reckless disregard of E.M.'s right to be free from discrimination on the basis of her disabilities in violation of the ADA.

29

144. The aforesaid actions of the District, its employees, and agents, were intentional and, at a minimum, were deliberately indifferent to the likelihood of a violation of E.M.'s right to be free from discrimination on the basis of her disabilities under the ADA based on the past occurrences of these same constitutional and statutory violations of the law.

145. As a direct, proximate, and foreseeable result of the aforesaid violation of the ADA, the Parents have been, and continue to be, damaged.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendant Summit City Board of Education:

a. Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b. Awarding compensatory damages;

c. Awarding reasonable attorney's fees and costs pursuant to *42 U.S.C. § 12205;* and

d. Awarding such further relief as the Court deems just and proper.

### COUNT V
### Violation of the NJLAD
### (The District)

146. The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

147. The NJLAD provides in pertinent part: "All persons shall have the opportunity … to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation … without discrimination because of … disability … subject only to conditions and limitations applicable alike to all persons."

148.    The schools operated by the District are places of public accommodation within the meaning of the NJLAD.

149.    As set forth with particularity in paragraphs 45 through 53 herein, the District knew that E.M. has autism spectrum disorder and, should have known, that E.M.'s actions and statements were indicative of her disabilities when DaSilva and Allen performed a suicide risk assessment on E.M. as aforesaid.

150.    After the District performed a suicide risk assessment on E.M., the District, at the insistence of Babis, refused, and has continued to refuse, to allow E.M. access to a public education in violation of the NJLAD.

151.    When Babis sent her emails on October 28, 2019 and October 30, 2019 insisting that the District be granted access to E.M.'s private medical information and threatening to deny E.M. of her right to a public education unless the Parents acceded to her demands, the District knew that DCP&P had found that there was no neglect as aforesaid.

152.    The actions of the District, and Babis in particular, in refusing, and continuing to refuse, to allow E.M. access to a public education were especially egregious in that they evidence an intentional, willful, wanton and reckless disregard of E.M.'s right to be free from discrimination on the basis of her disabilities in violation of the NJLAD.

153.    As a direct, proximate, and foreseeable result of the aforesaid violation of the NJLAD, the Parents have been, and continue to be, damaged.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendant Summit City Board of Education:

31

a.      Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.      Awarding compensatory damages;

c.      Awarding punitive damages;

d.      Awarding reasonable attorney's fees and costs pursuant to *N.J.S.A. § 10:5-27.1;* and

e.      Awarding such further relief as the Court deems just and proper.

**COUNT VI**
**42 U.S.C. § 1983**
**Retaliation In Violation of the Fourteenth Amendment**
**To The United States Constitution**
**(All Defendants)**

154.    The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

155.    The Court of Appeals for the Third Circuit has articulated two types of privacy interests rooted in the Fourteenth Amendment. *Doe v. Luzerne County,* 660 F.3d 169, 175 (3d Cir. 2011); *Malleus v. George,* 641 F.3d 560, 564 (3d Cir. 2011).  The first category is a right to confidentiality, and the second category is a right to autonomy. *Malleus,* 641 F.3d at 564; *Doe v. Delie,* 257 F.3d 309, 317 n. 5 (3d Cir. 2001).

156.    The first type of privacy right under the Fourteenth Amendment is the "individual interest in disclosure of personal matters."  *Doe,* 660 F.3d at 175; *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 178 (3d Cir. 2005). This category protects against disclosure of certain personal information, including: information containing specific "details of one's personal life," information "which the individual is ordinarily entitled to retain within the private enclave where

he may lead a private life," and information concerning "intimate facts of a personal nature." *Malleus,* 641 F.3d at 564.

157.    Third Circuit "jurisprudence takes an encompassing view of [the] information entitled to a right of privacy." *Sterling v. Borough v. Minersville,* 232 F.3d 190, 195 (3d Cir. 2000). The Third Circuit has deemed to be protected a private employee's medical information when sought by the government, *e.g., United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577 (3d Cir. 1980), medical, financial and behavioral information relevant to a police investigator's ability to work in dangerous and stressful situations, *e.g., Fraternal Order of Police v. City of Philadelphia,* 812 F.3d 105, 113 (3d Cir 1987), a public employee's medical prescription record, *e.g., Doe v. Southeastern Pennsylvania Trans. Auth. (SEPTA),* 72 F.3d 1133, 1137-38 (3d Cir. 1995), a minor student's pregnancy status, *Gruenke v. Seip* 225 F.3d 290, 302-03 (3d Cir. 2000), and an inmate's HIV-positive status. *Doe,* 257 F.3d at 317.

158.    The second type of privacy right under the Fourteenth Amendment "is the right to autonomy and independence in personal decision making." *Malleus,* 641 F.3d at 565.  In *Troxel v. Granville,* 530 U.S. 57, 65 (2000), the U.S. Supreme Court reiterated that the parental interest in "the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel* reaffirmed the validity of such long standing precedents as *Meyer v. Nebraska,* 262 U.S. 390, 401 (1923) (right of parents to control education of their children), *Pierce v. Society of Sisters,* 268 U.S. 510, 534-35 (1925) (right to direct upbringing and education of children), and *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944), where the Court said "the custody, care and nurture of child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

159.     The Third Circuit has stated that "[a]lthough a student may not enjoy a right of privacy to the same extent as a free adult, there are nevertheless limitations on intrusions by school authorities" and "[p]ublic schools must not forget that '*in loco parentis*' does not mean 'displace parents.'" *C.N.,* 430 F.3d at 183 (quoting *Gruenke*).  The Third Circuit has held that "[i]t is not unforeseeable, therefore, that a school's policies might come into conflict with the fundamental rights of parents to raise and nurture their child. But when such collisions occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke*, 225 F.3d at 306.

160.     The Parents engaged in protected activity under the Fourteenth Amendment of the United States Constitution when they resisted the District's persistent efforts to intrude upon E.M.'s right to privacy in her confidential medical information.

161.      The Parents engaged in protected activity under the Fourteenth Amendment of the United States Constitution when they resisted the District's persistent efforts to intrude upon their right to autonomy and independence in parental decision making with respect to E.M.

162.     Defendants took retaliatory actions against the Parents for engaging in activities protected under the  Fourteenth Amendments to the United States Constitution by refusing to allow E.M. to attend school and by reporting the Parents to DCP&P with unfounded accusations of neglect.

163.     Title 42 U.S.C. § 1983 of the United States Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom or suage, of any State or Territory …, subject, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….

164.    As of October 3, 2019, the District was quite content to have E.M. remain at home until the Parents succumbed to the District's demand that it be provided access to E.M.'s private medical information.

165.    There was no indication in Babis' October 3, 2019 email that the District's offer of home instruction was intended as a temporary measure and the District did not express any intention to report the Parents to DCP&P.

166.    By email dated October 8, 2019, Babis threatened to report the Parents to DCP&P in the event that the Parents did not accede to her demand that the District be provided with medical information about E.M.

167.    After receiving Babis' threating email, the Parents sent Babis a letter on October 9, 2019, which stated in pertinent part:

> In our view, the threat in your October 8th email that "an unwillingness to cooperate in the best interests of the student will require contact with the New Jersey Department of Children and Families, Division of Child Protection and Permanency (DCP&P)" is clearly retaliatory in light of our refusal to accede to your demand that the District be granted access to Emma's private medical information. If the District truly had a "deep concern" that [E.M.] might harm herself, it would have contacted DCP&P weeks ago.  We find it telling that your October 3rd email did not threaten to report us to DCP&P but advised that [E.M.] would be provided with home instruction in the event that we did not provide the District with [E.M.'s] private medical information.

168.    On October 11, 2019, Rosi Pena-Figuero, a caseworker from DCP&P, arrived at the Parents' home and informed them that a complaint for neglect had been lodged against them.

169.    Ms. Pena-Figuero toured the Parents' home and interviewed the Parents causing them mental anguish.

170.    Ms. Pena-Figuero interviewed E.M. and her brother C.M. causing both of them to be traumatized out of fear that the State would take them away from their parents.

171.    Ms. Pena-Figuero subsequently interviewed E.M.'s therapist causing the Parents humiliation and public embarrassment.

172.    Several weeks after her initial visit, Ms. Pena-Figuero visited the Parents' home a second time causing E.M. and her family additional mental anguish.

173.    After visiting the Parents' home a second time and, upon information and belief, after conducting further investigation, Ms. Pena-Figuero determined that the District's baseless allegation of neglect was unfounded.

174.    Upon information and belief, the Superintendent and the Board were aware of and acquiesced in the retaliatory actions taken against the Parents.

175.    The Parents' resistance to the District's persistent efforts to intrude upon E.M.'s right to privacy in her confidential medical information and upon their right to autonomy and independence parental decision making with respect to E.M. were the direct and proximate cause of Defendants' retaliatory actions, as seen in the proximity in time between the Parents' protected activities and Defendants adverse actions, and in the history of antagonism between the Parents' and Defendants.

176.    When Babis sent her emails on October 28, 2019 and October 30, 2019 insisting that the District be granted access to E.M.'s private medical information and threatening to deny E.M. of her right to a public education unless the Parents acceded to her demands, the District knew that DCP&P had found that there was no neglect as aforesaid.

177.    Notwithstanding the findings of DCP&P, Babis continued to retaliate against the Parents by refusing, and continuing to refuse, to allow E.M. to attend school unless the Parents acceded to Babis' demand that the District be provided access to E.M.'s private medical information.

178.   The aforesaid actions evidence an intentional, willful, wanton and reckless disregard of E.M.'s right to privacy in her confidential medical information and of the Parents' right to autonomy and independence in parental decision making with respect to E.M.. under the Fourteenth Amendment to the United States Constitution.

179.   As a direct, proximate, and foreseeable result of the intentional, malicious, and deliberately recklessness actions of Defendants as asserted herein, E.M. and her family suffered economic loss, mental anguish, severe anxiety, disruption of their personal lives, loss of enjoyment of the ordinary pleasures of every day, humiliation and public embarrassment.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendants Summit City Board of Education, Doreen Babis, Angelica DaSilva and Jane Does 1-10:

a.   Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.   Awarding compensatory damages;

c.   Awarding punitive damages;

d.   Awarding reasonable attorney's fees and costs pursuant to *42 U.S.C. § 1988;* and

e.   Awarding such further relief as the Court deems just and proper.

## COUNT VII
### (Retaliation in Violation of Section 504)
### (The District)

180.   The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

181.    Section 504 incorporates the rights, remedies and procedures of Title VI of the Civil Rights Act of 1972. The regulations implementing Title VI prohibit intimidatory and retaliatory acts. *See 34 C.F.R. §100.7(e).*

182.    A school district and individual defendants violate the anti-retaliation provisions of Section 504 when they falsely report a parent to a state agency engaged in child protective services in retaliation for the parents' advocacy on behalf of their child. *See Smith v. Harrington,* 2013 U.S. Dist. LEXIS 4195 (N.D. Cal. Jan. 9, 2013).

183.    The Parents engaged in protected activities under Section 504 by resisting the District's persistent efforts to intrude upon E.M.'s right to privacy in her confidential medical information and upon their right to autonomy and independence in parental decision making with respect to E.M.

184.    The District retaliated against the Parents be excluding E.M. from school and by taking adverse action against the Parents by reporting them to DCP&P with unfounded accusations of neglect and intentionally or with deliberate reckless indifference subjected E.M. and her family to economic loss, mental anguish, severe anxiety, disruption of their personal lives, loss of enjoyment of the ordinary pleasures of every day, humiliation and public embarrassment.

185.    As a direct, proximate, and foreseeable result of the intentional, malicious, and deliberately reckless actions of the District and its employees as asserted herein, E.M. and her family suffered economic loss, mental anguish, severe anxiety, disruption of their personal lives, loss of enjoyment of the ordinary pleasures of every day, humiliation and public embarrassment.

186.    The Parents' resistance to the District's persistent efforts to intrude upon E.M.'s right to privacy in her confidential medical information and upon their right to autonomy and independence in parental decision making with respect to E.M. were a direct and proximate cause

of Defendants' retaliatory actions, as seen in the proximity in time between the Parents' protected activities and Defendants adverse actions, and in the history of antagonism between the Parents' and Defendants.

187.    Further, when Babis sent her emails on October 28, 2019 and October 30, 2019 insisting that the District be granted access to E.M.'s private medical information and threatening to deny E.M. of her right to a public education unless the Parents acceded to her demands, the District continued to retaliate by denying E.M. access to the District's programs and services despite knowing that DCP&P had found that there was no neglect as aforesaid.

188.    The aforesaid actions of the District, and Babis in particular, in continuing to retaliate against the Parents by refusing, and continuing to refuse, to allow E.M. access to a public education evidence an intentional, willful, wanton and reckless disregard of E.M.'s right to be free from discrimination on the basis of her disabilities in violation of Section 504.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendant Summit City Board of Education:

a.    Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.    Awarding compensatory damages;

c.    Awarding reasonable attorney's fees and costs pursuant to *29 U.S.C. § 794(a)(b)*; and

d.    Awarding such further relief as the Court deems just and proper.

**COUNT VIII**
**(Retaliation in Violation of The ADA)**
**(The District)**

189.    The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

190.    The ADA prohibits retaliation, interference, coercion, and intimidation. *See 42 U.S.C. § 12203; 28 C.F.R. §35.134.*

191.    A school district and individual defendants violate the anti-retaliation provisions of the ADA when they falsely report a parent to a state agency engaged in child protective services in retaliation for the parents' advocacy on behalf of their child as aforesaid.

192.    The Parents engaged in protected activities under the ADA by resisting the District's persistent efforts to intrude upon E.M.'s right to privacy in her confidential medical information and upon their right to autonomy and independence in parental decision making with respect to E.M.

193.    The District retaliated against the Parents by excluding E.M. from school and taking adverse action against the Parents by reporting them to DCP&P with unfounded accusations of neglect and intentionally or with deliberate reckless indifference subjecting E.M. and her family to economic loss, mental anguish, severe anxiety, disruption of their personal lives, loss of enjoyment of the ordinary pleasures of every day, humiliation and public embarrassment.

194.    As a direct, proximate, and foreseeable result of the intentional, malicious, and deliberately reckless actions of the District and its employees as asserted herein, E.M. and her family suffered economic loss, mental anguish, severe anxiety, disruption of their personal lives, loss of enjoyment of the ordinary pleasures of every day, humiliation and public embarrassment.

195.    The Parents' resistance to the District's persistent efforts to intrude upon E.M.'s right to privacy in her confidential medical information and upon their right to autonomy and independence in parental decision making with respect to E.M. were the direct and proximate cause of the District's retaliatory actions, as seen in the proximity in time between the Parents' protected activities and Defendants adverse actions, and in the history of antagonism between the Parents' and Defendants.

196.    Further, when Babis sent her emails on October 28, 2019 and October 30, 2019 insisting that the District be granted access to E.M.'s private medical information and threatening to deny E.M. of her right to a public education unless the Parents acceded to her demands, the District continued to retaliate by denying E.M. access to the District's programs and services despite knowing that DCP&P had found that there was no neglect as aforesaid.

197.    The aforesaid actions of the District, and Babis in particular, in continuing to retaliate against the Parents by refusing, and continuing to refuse, to allow E.M. access to a public education evidence an intentional, willful, wanton and reckless disregard of E.M.'s right to be free from discrimination on the basis of her disabilities in violation of the ADA.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendant Summit City Board of Education:

a.    Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.    Awarding compensatory damages;

c.    Awarding reasonable attorney's fees and costs pursuant to *42 U.S.C. § 12205;* and

d.    Awarding such further relief as the Court deems just and proper.

## COUNT IX
## Retaliation in Violation of the NJLAD
## (The District)

198.    The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

199.    The anti-retaliation provisions of the NJLAD, provide in pertinent part:

It shall be … an unlawful discrimination:

For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified, or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or, on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.

*N.J.S.A. § 10-5-12(d).*

200.    As set forth with particularity in paragraphs 45 through 53 herein, the District knew that E.M. has autism spectrum disorder and, should have known, that E.M.'s actions and statements were indicative of her disabilities when DaSilva and Allen performed a suicide risk assessment on E.M. as aforesaid.

201.    The District had no right to insist that that it be allowed to speak with the evaluating clinician at Overlook Hospital or to otherwise have access to E.M.'s private medical information because, among other things, communications between a licensed clinical social worker during the course of diagnosis and treatment are privileged under Federal and New Jersey law.

202.    The Parents resisted the District's persistent efforts to intrude upon E.M.'s right to keep her medical information private as aforesaid.

203. The actions of Babis and other District employees retaliated against the Parents by excluding E.M. from school and taking adverse action against the Parents by reporting them to DCP&P with unfounded accusations of neglect.

204. The actions of Babis and other District employees were especially egregious in that they evidence an intentional, willful, wanton, and reckless disregard of E.M.'s right to access a public education.

205. The actions of Babis and other District employees were especially egregious in that they evidence an intentional, willful, wanton, and reckless as evidenced by the unfounded accusations of neglect thereby subjecting E.M. and her family to economic loss, mental anguish, severe anxiety, disruption of their personal lives, loss of enjoyment of the ordinary pleasures of every day, humiliation and public embarrassment.

206. The Parents' resistance to the District's persistent efforts to intrude upon E.M.'s right to privacy in her confidential medical information and upon their right to autonomy and independence in parental decision making with respect to E.M. were a direct and proximate cause of Defendants' retaliatory actions, as seen in the proximity in time between the Parents' protected activities and Defendants adverse actions, and in the history of antagonism between the Parents' and Defendants.

207. Further, when Babis sent her emails on October 28, 2019 and October 30, 2019 insisting that the District be granted access to E.M.'s private medical information and threatening to deny E.M. of her right to a public education unless the Parents acceded to her demands, the District continued to retaliate by denying E.M. access to the District's programs and services despite knowing that DCP&P had found that there was no neglect as aforesaid.

208.   The actions of the District, and Babis in particular, in continuing to retaliate against the Parents by refusing, and continuing to refuse, to allow E.M. access to a public education evidence an intentional, willful, wanton and reckless disregard of E.M.'s right to be free from discrimination on the basis of her disabilities in violation of the NJLAD.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendant Summit City Board of Education:

a.   Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.   Awarding compensatory damages;

c.   Awarding punitive damages;

d.   Awarding reasonable attorney's fees and costs pursuant to *N.J.S.A. § 10:5-27.1;* and

e.   Awarding such further relief as the Court deems just and proper.

## COUNT X
### Aiding and Abetting Retaliation in Violation of the NJLAD.
### (Babis, DaSilva and Jane Does 1-10)

209.   The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

210.   The anti-retaliation provisions of the NJLAD, provide in pertinent part:

It shall be … an unlawful discrimination:

e)   For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so.

*N.J.S.A. § 10-5-12(e).*

44

211.    By virtue of the actions described, *supra* at paragraphs 160 through 178 and 199 through 208, the District, Babis, DaSilva and the Doe Defendants violated the anti-retaliation provisions of the NJLAD.

212.    By virtue of the actions described, *supra,* Babis, DaSilva, and the Doe Defendants did aid, abet, incite, compel and/or coerce the District to take reprisals against the Parents, in violation of the NJLAD.

213.    As a direct, proximate, and foreseeable result of the especially egregious actions of Defendants as asserted herein, E.M. and her family suffered economic loss, mental anguish, severe anxiety, disruption of their personal lives, loss of enjoyment of the ordinary pleasures of every day, humiliation and public embarrassment.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendants Doreen Babis, Angelica DaSilva and Jane Does 1-10:

a.    Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.    Awarding compensatory damages;

c.    Awarding punitive damages;

d.    Awarding reasonable attorney's fees and costs pursuant to *N.J.S.A. § 10:5-27.1;* and

e.    Awarding such further relief as the Court deems just and proper.

**COUNT XI**
**Violation of the New Jersey Civil Rights Act**
**(All Defendants)**

214. The Parents repeat each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

215. The District's actions, omissions, practices violated E.M.'s right to a thorough and efficient education as guaranteed her by the New Jersey Constitution.

216. Throughout the entire time that E.M. has been precluded from attending school, the District failed to afford the Parents a hearing as aforesaid.

217. Throughout the entire time that E.M. has been precluded from attending school, the District failed to provide the Parents with an opportunity to cross-examine Plofsky, Banker, DaSilva, Allen and Babis as aforesaid.

218. *N.J.S.A. § 10:6-2* provides, in part, that any person:

who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

219. By its policies, practices, actions, or omissions, the District, its employees and agents, acting under color of state law, violated E.M.'s right to procedural due process as guaranteed her by the New Jersey Constitution, as enforceable through the New Jersey Civil Rights Act.

220. By reason of the foregoing, the District violated the New Jersey Civil Rights Act.

46

47

221.    By virtue of the actions described, *supra* at paragraphs 160-178, 183-188, 192-197, and 200-208*,* the District violated the New Jersey Civil Rights Act by retaliating against the Parents.

WHEREFORE, Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., demand that Judgment be entered in their favor and against the Defendants Summit City Board of Education, Doreen Babis, Angelica DaSilva and Jane Does 1-10:

a.      Permanently enjoining and restraining the Summit City Board of Education from denying E.M. access to a public education;

b.      Awarding compensatory damages;

c.      Awarding punitive damages;

d.      Awarding reasonable attorney's fees and costs pursuant to *N.J.S.A. § 10:6-2(f);* and

e.      Awarding such further relief as the Court deems just and proper.

WALSH PIZZI O'REILLY FALANGA LLP
Attorneys for Plaintiffs,
J.M. and E.M., individually and o/b/o E.M.


By:    */s/ Thomas J. O'Leary*
        Thomas J. O'Leary

Date: March 22, 2023

## JURY DEMAND

The Plaintiffs J.M. and E.M., individually and on behalf of their minor child E.M., hereby demand a trial by jury on all issues so triable.

47

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

Mandatory arbitration pursuant to Local Civil Rule of Procedure 201.1 is not appropriate in this case because the damages sought exceed $150,000.00.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to L. Div. R. 11.2, I hereby certify that, with the exception of *J.M. and E.M. o/b/o E.M.,* OAL Docket No. EDS 09480-21, Agency Ref. No. 2022-33482, the within action is not the subject of any other action pending in any Court, or of any pending arbitration or administrative proceeding.

WALSH PIZZI O'REILLY FALANGA LLP
Attorneys for Plaintiffs,
J.M. and E.M., individually and o/b/o E.M.


By: ___*/s/ Thomas J. O'Leary*___
        Thomas J. O'Leary

Date: March 22, 2023

48